# EXHIBIT A

1  IN THE UNITED STATES BANKRUPTCY COURT

2  FOR THE DISTRICT OF DELAWARE

3  ------------------------------------x

4                    CHAPTER 11

5  IN RE:          CASE NO. 22-10228 (JTD)

6  RETROTOPE, INC.,

7  DEBTOR.

8

9  ------------------------------------x

10

11

12                 July 7, 2022

13

14

15

16

17      REMOTE 30(b)(6) DEPOSITION OF

18         DANIEL VICTOR PERLROTH

19

20

21

22

23  Stenographically Reported By:

24  Mark Richman, CSR, CCR, RPR, CM

25  Job No. 213795

1                D. PERLROTH - 7.7.22

2    just show you all nine pages since we're

3    not in the same room and you can't leaf

4    through it.

5          Is Exhibit 3 the Kodiak June 26

6    bid structure document that Kodiak sent

7    to SSG and to Retrotope on Sunday, June

8    26?

9    A.    I think it is, yes.

10   Q.    Is it, the information that was

11   contained herein, to the extent it

12   contained information from third party

13   sources, Kodiak was truthful and

14   accurate in terms of the representations

15   it made therein; is that correct?

16   A.    I believe so.  That's what we

17   strive for.

18   Q.    Now Kodiak is aware that the

19   shareholder group has filed an objection

20   to the results of the auction; is that

21   correct?

22   A.    Yes.

23   Q.    And that Kodiak has joined in to

24   the extent it can and has provided a

25   statement regarding the proposed sale of

1            D. PERLROTH - 7.7.22

2    the debtor's assets; is that correct?

3    A.    Kodiak is, yes.

4    Q.    And Kodiak has agreed to pay 90

5    percent of the expert's fees who will be

6    testifying on behalf of the shareholder

7    group; is that correct?

8    A.    Yes, for --

9    Q.    How did that arrangement come

10   about?

11   A.    The hiring of the valuation

12   expert?

13   Q.    The agreement that Kodiak would

14   pay 90 percent of the expenses of the

15   expert.

16   A.    Well, it's more expensive than

17   one would think.  So Kodiak felt that it

18   was important to bring an expert in

19   because we didn't feel that our bid was,

20   was assessed and valued properly during

21   the auction.  So we wanted to bring in

22   an expert and the expert, we don't know

23   the exact price, but it may be

24   expensive.

25            And so because we see it as a

1           D. PERLROTH - 7.7.22

2    continuation of the process of

3    evaluating and exploring Retrotope, we

4    wanted to bring in this expert.  And

5    it's expensive.  And so Kodiak made that

6    proposal.

7    Q.    And how did the shareholder group

8    respond?

9    A.    I don't know.  I assume that they

10   were pleased.  But I don't actually know

11   because I didn't speak with them

12   directly about it.

13         I think counsel spoke with their

14   counsel.

15   Q.    And how did the 90 percent number

16   come as opposed to a hundred percent or

17   75 percent?  How did Kodiak arrive at

18   the 90 percent?

19   A.    We wanted to make sure that, that

20   they had some skin in the game.

21   Q.    "They" being the shareholder

22   group?

23   A.    Mm-hmm, yeah.

24   Q.    Does Kodiak have any other

25   agreements with the shareholder group

1           D. PERLROTH - 7.7.22

2   other than this agreement that it would

3   be responsible for 90 percent of the

4   expert's expenses?

5   A.    Not that I'm aware of, no.

6   Q.    So Kodiak hasn't agreed to pay

7   the shareholder group's legal fees or

8   anything else?

9   A.    No.

10  Q.    How soon after the auction did

11  Kodiak make the decision to approach the

12  shareholder group with this offer?

13  A.    Well, the auction only happened a

14  couple, like a week ago or so.  So I

15  would say when we were -- I think the

16  auction was maybe a Monday.  And towards

17  the end of that week we were talking

18  with our counsel and ourselves because

19  we didn't feel the right methodology had

20  been applied.  And when we -- so we

21  wanted to get an expert.

22          And so as we thought about who

23  could be a good expert, we were thinking

24  of, you know, different kinds of

25  experts.  And then we don't -- I'm not a

1          D. PERLROTH - 7.7.22

2  lawyer but we don't have standing,

3  right, I guess.  So therefore we want to

4  work with the, with the shareholders to

5  be able to continue demonstrating our

6  interest in, in Retrotope and the

7  products because we want to develop

8  those products.  We believe they can be

9  important.

10          And so when did we speak with the

11  shareholders?  I think our counsel,

12  Mr. Litvak, spoke with the shareholders'

13  counsel.

14          That's kind of how it came about,

15  I think.

16          Is that helpful?

17   Q.    It is, thank you.

18          And so was the 90 percent the

19  first offer that was made by Kodiak or

20  did it offer a lower amount and have to

21  go up to 90 percent?

22   A.    We like to -- I believe 90

23  percent was our offer.

24   Q.    Why did Kodiak wait until the day

25  before to provide to SSG and Retrotope

1            D. PERLROTH - 7.7.22

2   the June 26 bid structure document?

3    A.    I don't think there was a

4   particular reason.  We were working on

5   the documents.  We were -- I think we

6   had diligence meetings just within the

7   few days before that.  And also we were

8   engaged in a variety of due diligence

9   activities.

10   Q.    Was there ever any consideration

11  to provide a milestone payment before

12  regulatory approval such as at the

13  reaching of phase 1, phase 2, phase 3?

14   A.    Yes, we explored those ideas.

15   Q.    And why were those not included

16  in the ultimate bid document?

17   A.    In the end, we made a

18  determination on structure and the bid

19  that we submitted represented, you know,

20  was like what we thought was the best

21  bid to make.

22   Q.    How many times has Kodiak bid on

23  another company's assets before this

24  one?

25            MR. LITVAK:  Objection to form.

1              D. PERLROTH - 7.7.22

2    A.    I can only answer how I would go

3    about it.  And I would want to learn

4    more about such an important topic with

5    20 years of investment in time and

6    money, then I would want to rely on more

7    than what SSG gave to the board, from

8    what I can tell because I wasn't there.

9            I would want to know more and I

10   would want to try and dig deeper.

11   That's my opinion.

12   Q.    Forgive me if I asked this, but

13   did Kodiak have anything to offer as an

14   alternative to the methodology that SSG

15   proposed?

16   A.    I think as I said, we were hoping

17   to be able to have a dialogue in some

18   way with a responsive counterparty and

19   we didn't feel we had that ability.

20           So I think we mentioned and said

21   in the auction, you know, that we

22   mentioned an approach that we -- I don't

23   have the transcript.  But I think we

24   said an approach that used a lower

25   discount rate and applied probability of

1                   D. PERLROTH - 7.7.22

2    success in that context, you know, is

3    the right way to do it.  And that maybe

4    we didn't feel there was an openness to

5    engaging in that.

6              I don't have the transcript.

7    Q.    No, that's fair.  Okay.

8              Doctor, have you provided any

9    information to Mr. Manning, the expert

10   that is being -- whose 90 percent of

11   expenses are being paid by Kodiak?

12   A.    Yes.

13   Q.    And what have you talked with

14   Mr. Manning about, or Dr. Manning,

15   excuse me?

16   A.    We talked about different types

17   of valuation models.  We talked about,

18   you know, our enthusiasm about the

19   technology and the products.

20   Q.    And just so I'm clear, forgive me

21   if this is elementary and I missed it,

22   but with the bid structure document, it

23   appears that Kodiak was valuing the

24   assets or the payout under the royalties

25   and under the milestones at a billion

1          D. PERLROTH - 7.7.22

2    dollars.

3          Am I misunderstanding that or was

4    there --

5    A.    That's not correct.

6    Q.    -- something you expected further

7    to happen?

8    A.    No, we didn't present that as a

9    valuation.  It presented, you know,

10   revenues and timing.

11   Q.    Okay.

12   A.    But it didn't go the next step of

13   valuing.  It doesn't say this is a

14   valuation, right, it just says these are

15   revenues that we think are possible and

16   achievable if we develop this asset with

17   our capabilities and our capital.  And

18   this is the timing we think is

19   achievable and reasonable.

20          And then we modeled in a royalty

21   stream over time and then we discounted

22   that back like as a DCF kind of thing.

23          But we didn't go the step of

24   claiming it was a valuation.  It really

25   established the pieces.

1                   D. PERLROTH - 7.7.22

2    Q.    I guess I'm just curious why

3    didn't, you went to all this trouble,

4    why didn't Kodiak present what it

5    thought was the true valuation of its

6    bid?

7    A.    One reason is things came

8    together very quickly.  There was a time

9    pressure on this and we were just

10   completing our diligence.  We had a

11   number of conversations.  I think we,

12   didn't we have one on the Friday or

13   Thursday of the week before?

14         So things came together quickly

15   and we put those PowerPoint decks

16   together, you know, to really help to

17   showcase our excitement and commitment

18   and to have that dialogue with

19   Retrotope, you know, board or management

20   who were invited to that, that Zoom.

21   Q.    Okay.  But so it just, it was a

22   time crunch thing?  I guess what I'm

23   trying to understand is, you pointed out

24   to me early on that you thought the

25   purpose of being at the auction was to,

1                 D. PERLROTH - 7.7.22

2    you know, place a bid in order to

3    successfully, hopefully win the product,

4    win the assets.

5           And so I guess I'm just sort of

6    struggling that it seems like Kodiak did

7    everything but the final step and I'm

8    just wondering why it didn't go the

9    final step knowing that this was going

10   to be looked at and used inside the

11   auction.

12    A.    I guess we didn't know exactly

13   what the auction was going to be like.

14   Whether, you know... you know, we've

15   never done an auction before.

16    Q.    Okay.

17    A.    And like I said, SSG told us cash

18   is king.  So that confused us.

19                      ***

20          (Continued on next page for

21     purpose of jurat.)

22

23

24

25

1              D. PERLROTH - 7.7.22

2                     ***

3         MR. MOHR:  Doctor, thanks so much

4     for your time.  I apologize for

5     running over three minutes.

6         THE WITNESS:  No problem.  Thanks

7     a lot.  I appreciate it.

8         MR. LITVAK:  We will accept that

9     apology.  We can go off the record.

10        (Time noted:  7:33 p.m.)

11 _____

12 DANIEL VICTOR PERLROTH

13

14 _____

15 Subscribed and sworn to

16 before me this _____

17 day of _____, 2022.

18

19 _____

20     Notary Public

21

22

23

24

25

1  IN THE UNITED STATES BANKRUPTCY COURT

2  FOR THE DISTRICT OF DELAWARE

3  -------------------------------------x

4                    CHAPTER 11

5  IN RE:          CASE NO. 22-10228 (JTD)

6  RETROTOPE, INC.,

7  DEBTOR.

8

9  ------------------------------------x

10

11

12                  July 6, 2022

13

14

15

16

17        REMOTE DEPOSITION OF

18        CHARLES ROBERT CANTOR

19

20

21

22

23  Stenographically Reported By:

24  Mark Richman, CSR, CCR, RPR, CM

25  Job No. 213794

1                    C. CANTOR - 7.6.22

2    A.    Yes.

3    Q.    For RT001 they don't have to fund

4    trials to get FDA approval?

5    A.    That's correct.

6    Q.    So FDA approval, how is that

7    going to be accomplished if no more

8    trials are run?

9    A.    Well, there are two ways.  As I

10   tried to indicate, INAD is potentially

11   approvable right now with no additional

12   clinical trial data.  They just have to

13   make the argument and appeal to the FDA.

14   Q.    And then is there another way

15   other than INAD?

16   A.    Get somebody else to fund the

17   trial.

18   Q.    So let me ask it this way.  If no

19   one funds the trials, the milestone

20   payment is not going to be made, is it,

21   Dr. Cantor?

22   A.    Unless INAD can be successfully

23   argued through the FDA.

24   Q.    Okay.  But other than with INAD

25   if no one funds the trials, there's not

1                  C. CANTOR - 7.6.22

2    going to be a milestone payment, would

3    you agree with me?

4    A.    Yes.

5    Q.    How did it come about that Kodiak

6    agreed to pay 90 percent of the fee for

7    the expert that the dissenting

8    shareholders have agreed are putting up

9    Mr. Manning, I think it is, tell me how

10   that agreement came about?

11   A.    I don't know.

12         MR. TRIGG:  Objection.

13   Q.    You don't have any idea?

14         MR. TRIGG:  Hold on.  I'm going

15    to object and I'm going to caution

16    you not to get into any

17    attorney-client communication.

18         I think he already answered he

19    doesn't know.

20   A.    I was going to say I think it had

21   something to do with counsel.  I was not

22   involved.

23   Q.    Did you have a discussion with

24   Dr. Molinari or Dr. Saal outside of

25   counsel's presence about whether or not

1                C. CANTOR - 7.6.22

2    an expert should be hired to challenge

3    the auction results?

4         MR. TRIGG:   That was a yes or no

5      question.

6    A.    No.

7    Q.    You did not?

8    A.    No.

9    Q.    Is there any other agreement that

10   you are aware of with regard to Kodiak

11   funding any position or any work that

12   the dissenting shareholders are

13   performing in this case?

14   A.    I'm not aware of any.

15   Q.    Have you talked with Dr. Saal or

16   Dr. Molinari about whether or not Kodiak

17   could fund anything else in this case?

18        MR. TRIGG:   Objection.   That's a

19     yes or no question.   Just caution you

20     not to reveal any attorney-client

21     communications.

22   A.    No.

23   Q.    No, you haven't had it or no,

24   you're not going to answer the question?

25   A.    No, I haven't had a discussion

1   IN THE UNITED STATES BANKRUPTCY COURT

2   FOR THE DISTRICT OF DELAWARE

3   -------------------------------------x

4                     CHAPTER 11

5   IN RE:          CASE NO. 22-10228 (JTD)

6   RETROTOPE, INC.,

7   DEBTOR.

8

9   -------------------------------------x

10

11

12                   July 6, 2022

13

14

15

16

17         REMOTE DEPOSITION OF

18         ROBERT JAMES MOLINARI

19

20

21

22

23   Stenographically Reported By:

24   Mark Richman, CSR, CCR, RPR, CM

25   Job No. 213794

1                 R. MOLINARI - 7.6.22

2    A.    That's correct.

3    Q.    Okay.  So when you saw the bid

4    structure document of June 26, was there

5    anything in it to you that seemed

6    inappropriate?

7    A.    Not really.

8    Q.    And so if I understood the -- if

9    I'm reading the bid, they were

10   projecting cumulative royalty and

11   milestone payments of $4 billion.  Does

12   that sound right?

13   A.    That is quite, quite, quite

14   typical of what those kind of royalty

15   rates would give in that market, yes.

16   Q.    Okay.  And they had a net present

17   value of roughly $1 billion for those

18   payments.  Does that sound about right?

19   A.    I believe that was in their

20   example, yes.

21   Q.    And you don't have any idea what

22   sort of figures or discount or

23   probability of success or anything went

24   into their calculation, correct?

25   A.    No, not at the time.  Not even

1              R. MOLINARI - 7.6.22

2   now, really.

3    Q.    Have you talked to Kodiak since

4   the auction?

5    A.    No, I don't believe so.

6    Q.    You haven't gotten an email from

7   them?

8    A.    I simply, I got an email because

9   the CEO was planning to meet on June

10  30th with Dr. Shchepinov for dinner and

11  we did exchange emails simply whether

12  that dinner had happened or not.

13   Q.    Okay.

14   A.    That's all --

15   Q.    I'm sorry?

16   A.    That's, that's about it.  We've

17  been trying to keep the processes

18  independent.

19   Q.    When did you learn that Kodiak

20  was going to pay 90 percent of the costs

21  for the expert that the shareholder

22  group wanted to retain?

23        MR. TRIGG:  The question is

24    vague.  Objection.

25   A.    That was organized -- I had

1          R. MOLINARI - 7.6.22

2   nothing to do with that.  That was an

3   email I believe I got from counsel after

4   they decided that.

5   Q.    So you weren't aware that you and

6   the other members of the shareholder

7   group had not talked about that --

8   A.    No.

9   Q.    -- before you got that email?

10  A.    Correct.

11  Q.    Is Kodiak paying for any other

12  services that the shareholder group is

13  incurring, whether it's counsel fees or

14  anything else?

15  A.    None.

16  Q.    So in the event that Kodiak's bid

17  is somehow declared the winner, do you

18  have any agreement with Kodiak about

19  providing services to them at that

20  point?

21  A.    None.

22  Q.    So you won't be a consultant to

23  them or an employee or anything in that

24  regard?

25  A.    That's not what you asked.  You

1            R. MOLINARI - 7.6.22

2  asked do I have an agreement now.  I

3  don't know.  I have none, we've had no

4  discussions about it, so I don't know.

5  I might.  If they asked me later, I

6  don't know what I will do.

7   Q.    But you haven't had any

8  discussions with them --

9   A.    No.

10   Q.    --  about that at this point?

11   A.    No.

12   Q.    Who was your contact at Kodiak in

13  the half dozen or so communications that

14  you had with them?

15   A.    Initially the CMO Jason Ehrlich

16  which was the person in whom Harry had a

17  connection to someone in Stanford and

18  then later Victor Perlroth who is the

19  CEO.

20   Q.    Did you believe that there was

21  any cash bid that could have been

22  offered that would have been sufficient

23  for and the shareholder group would have

24  joined in believing it was appropriate?

25        MR. TRIGG:  Objection to form.

1   IN THE UNITED STATES BANKRUPTCY COURT

2   FOR THE DISTRICT OF DELAWARE

3   ------------------------------------x

4                      CHAPTER 11

5   IN RE:          CASE NO. 22-10228 (JTD)

6   RETROTOPE, INC.,

7   DEBTOR.

8

9   ------------------------------------x

10

11

12                   July 6, 2022

13

14

15

16

17          REMOTE DEPOSITION OF

18           HARRY JEROME SAAL

19

20

21

22

23   Stenographically Reported By:

24   Mark Richman, CSR, CCR, RPR, CM

25   Job No. 213794

1                    H. SAAL - 7.6.22

2   and some analysis.

3            And as I said, on the face of it,

4   that calculation just seems ridiculous.

5    Q.    Okay.  So just so I'm clear.  If

6   you're on the board at the time the

7   motion is made to declare RTMFP the

8   winner, it's your testimony here today

9   that you can't say whether you would

10  have voted against that motion or

11  whether you would have voted in favor of

12  that motion; you would have needed more

13  information.  Do I have that right?

14           MR. TRIGG:  Objection to form.

15   A.    I can't say how I -- I can't say

16  how I would vote under those

17  circumstances, that is true.

18           MR. MOHR:  We can take a

19    two-minute break, I'm about finished.

20    As I understand, Dr. Saal only has an

21    hour of availability.

22           MR. TRIGG:  That's correct.

23           THE WITNESS:  It's midnight here.

24    It's been a long hundred degree day.

25           (A recess was had.)

1                    H. SAAL - 7.6.22

2     BY MR. MOHR:

3          Q.    Dr. Saal, did you have any

4     communications with Kodiak about them

5     contributing toward the payment of any

6     expert witness that has been retained on

7     behalf of the preferred shareholders in

8     this case?

9          A.    That's information I've shared

10    with my counsel.  I have no comment.

11         Q.    I'm not asking you to comment on

12    your communications with your counsel.

13    I'm asking whether you had

14    communications with anyone from Kodiak

15    about them being willing to pay for I

16    believe it's Mr. Richard Manning to

17    provide testimony in this case.

18              Did you have any such

19    conversations with Kodiak?

20         A.    I've had no, I've had no

21    communication with Kodiak in this

22    matter.

23         Q.    So you did not make that request

24    of Kodiak?

25         A.    That is true.

1                H. SAAL - 7.6.22

2    Q.    Are you aware of any, and again

3   I'm not looking if you learned it from

4   counsel, are you aware of Dr. Saal or

5   Dr. Molinari having any such

6   communications with Kodiak?

7    A.    I think you should rephrase that.

8    Q.    Did you learn from Dr. Saal --

9   excuse me.

10         Did you learn from Dr. Molinari

11   or Dr. Cantor whether they had had any

12   conversations on that topic with Kodiak?

13    A.    I have not inquired about that.

14    Q.    They haven't told you that?

15    A.    That's correct.

16         (Continued on next page for

17   purpose of jurat.)

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4       _____
                                        )
 5       In re:                         )
                                        )
 6       RETROTOPE, INC.,               ) Case No.
                                        ) 22-10228(JTD)
 7                                       )
                 Debtor.                )
 8       _____
 9
10           REMOTE DEPOSITION OF RICHARD L. MANNING, Ph.D.
11                   Saturday, July 9, 2022
12                        Volume I
13
14
15
16
17
18
19
20
21
22       Reported Remotely and Stenographically by:
23       Gail E. Kennamer, CSR 4583, CCRR
24       Job No. 5314124
25       Pages 1 - 113
```

Page 1

1    either what you have learned since issuing your report or    10:11

2    including what you heard today, do you have any intention

3    on amending your report?

4         A.    Not based on anything that I have heard so far;

5    but if new information becomes available that requires or    10:12

6    suggests it should be amended, I could do that.

7         Q.    Okay.  And is it fair to say you were trying to

8    be truthful and forthright in your report?

9         A.    Yes, it is.

10        Q.    And you -- how long have you been working on    10:12

11   this report?

12        A.    Couple of weeks.

13        Q.    Okay.  Is that -- Was there anything in the

14   report that you felt information you didn't have that you

15   needed for your report?    10:12

16        A.    No.

17        Q.    How many versions approximately did you go

18   through?

19        A.    I have no idea.

20        Q.    How many hours have you personally worked on    10:12

21   this?

22        A.    I don't know exactly, but in the neighborhood of

23   50.

24        Q.    What about the rest of your team there at

25   Intensity, how long have they worked on this?    10:12

Page 30

```
1        A.   Each, there are three others who have worked      10:13

2   different amounts.  I don't know all of their numbers.  I

3   know that the other economist that worked on my team has

4   put in a little more time than I have.  I think so -- I

5   think maybe 60 or so.  I don't have that information right   10:13

6   at my hands, so I don't know.

7        Q.   Okay.

8        A.   And the others less than -- less than that, but

9   I don't know how much.

10       Q.   Now, can you tell me your report here, I'm        10:13

11  looking at page 2 of Exhibit 2, the second page, Section

12  1.2 Scope of Work, and in Paragraph 6 it says, "Intensity

13  has been retained by Buchalter, APC on behalf of Charles

14  Cantor, Robert Molinari, and Harry Saal."

15       Did I read that correctly?                             10:13

16       A.   You did.

17       Q.   Okay.  When -- When was Intensity first

18  contacted by Buchalter?

19       A.   About two weeks ago.

20       Q.   Okay.  Now, was it Buchalter that first          10:14

21  contacted you or was it the Pachulski firm or someone from

22  Kodiak who first contacted you?

23       A.    I believe my first contact was from someone at

24  Pachulski.

25       Q.   Okay.  What did they tell you?                    10:14
```

Page 31

```
 1          A.   Asked me if I would -- If I would be available,   10:14
 2    if I could get this work done in that timeframe, described
 3    the nature of the question, and asked me to run a conflict
 4    check.
 5          Q.   What did they describe the nature of the          10:14
 6    question to be?
 7          A.   Oh, I'm not sure I remember exactly what they
 8    said other than that it was a bankruptcy issue, and that
 9    it involved valuing the assets of the -- some assets of
10    the company.                                                 10:14
11          Q.   Who from -- I'm sorry.  I didn't mean to
12    interrupt you.  Is there anything else?
13          A.   No, no.
14          Q.   Okay.  Who from Pachulski contacted you?
15          A.   Maxim -- I'm sorry, Max, if you are on the line,  10:15
16    and I'm blanking on your last name.
17          Q.   So Max contacted you from Pachulski?
18          A.   I believe.
19          Q.   So why -- why is it that if the Pachulski firm
20    contacted you, you were actually retained by Buchalter?     10:15
21          A.   That was an agreement that they reached.  I
22    don't know the --
23          Q.   What do you mean by that, that was an agreement
24    that was reached?
25          A.   Max Litvak.  Litvak.  I'm sorry.  That was        10:15
```

                                                        Page 32

```
 1      bothering me.                                         10:15

 2          I know that both parties are interested, and they

 3      discussed how they would support the work.  I don't know.

 4      I was not part of that conversation, so I guess I don't

 5      know more than that.                                  10:16

 6          Q.   So why weren't you retained by the Pachulski

 7      firm?

 8          A.   I don't know.

 9          Q.   Have you ever been in a situation where you are

10      contacted by one firm, and then hired and indicate that  10:16

11      you have been retained by a different firm for the same

12      matter?

13          A.   I have been in cases where multiple firms are

14      representing the clients I'm interested in -- that are

15      interested in the case.  I guess I don't -- I don't know  10:16

16      how I would distinguish between the two.

17          Q.   Do you have an understanding of who is paying

18      Intensity's bill and in what percentage?

19          A.   I do.

20          Q.   What's that understanding?                   10:16

21          A.   My understanding is that the Kodiak is paying

22      90 percent of the bill.

23          Q.   And why is that?

24          A.   I don't know.  I was not part of that

25      negotiation.                                          10:17
```

Page 33

1          Q.   How did you come to learn that?                    10:17

2          A.   It's in the engagement letter.

3          Q.   And is the engagement letter from Buchalter?  Is

4     it from Pachulski or is it -- which firm is it from?

5          A.   I am pretty sure it's from Buchalter since they   10:17

6     are -- you know, it says I have been retained by them.  I

7     haven't read it recently and don't remember exactly what

8     it says.

9          Q.   Okay.  Did that cause you any concern entering

10    into that engagement like that?                             10:17

11         A.   No.

12         Q.   Is $985 your hourly rate in this case?

13         A.   It is.

14         Q.   Okay.  And have you charged that in other cases

15    that you worked on before this one?                         10:17

16         A.   Yes.

17         Q.   Did you have a discussion with anyone about

18    whether or not Kodiak itself or Pachulski could retain you

19    to present your opinions to the Court?

20         A.   We did not discuss -- I don't remember            10:18

21    discussing the pros and cons of that, no.

22         Q.   Okay.  So no one told you that Kodiak doesn't

23    have standing to appear to the Court and to object and to

24    provide an opinion like you are doing here today?

25         A.   No.  Those are legal questions I wouldn't have    10:18

                                                      Page 34

```
 1        focused on even if they had.  I don't remember that.        10:18
 2             Q.    Okay.  So if I represent to you that's the case,
 3        does that cause you any concern or your engagement in this
 4        matter?
 5             A.    No.  Because the thing I was engaged to do was a   10:18
 6        matter of assessing facts and evidence.  It's not -- I
 7        didn't -- I don't think it matters as much the nature of
 8        the relationship between the two firms.
 9             Q.    Have you ever done any work for Buchalter
10        before?                                                      10:19
11             A.    I have not.
12             Q.    Have you done any work for Pachulski before?
13             A.    I have not.
14             Q.    Okay.  What about for Mr. Garfinkle or any -- or
15        anyone from his firm, have you ever -- to your knowledge,    10:19
16        have you ever done work for any of them?
17             A.    Not that I know of, no.
18             Q.    Prior to being contacted about two weeks ago,
19        had you ever heard of Retrotope?
20             A.    No.                                               10:19
21             Q.    Had you ever heard of Kodiak?
22             A.    I can't say that I had, but I have heard of a
23        lot of companies.  It's possible I would have come across
24        them and not remembered, but I have not worked for them.
25             Q.    Okay.  So during the course of your preparation   10:19
```

Veritext Legal Solutions
866 299-5127

```
 1    of this report, how many times did you talk with a lawyer    10:20

 2    from Buchalter?

 3         A.   I don't know.

 4         Q.   More than a dozen?

 5         A.   Probably not.                                        10:20

 6         Q.   Okay.  What about lawyers from Pachulski, how

 7    many times?

 8         A.   Roughly, the same.  They were very often in the

 9    same meetings.

10         Q.   Okay.  And other than the lawyers, did you --       10:20

11    Let me back up.

12         I'll refer to three individuals by the name of

13    Charles Cantor, Robert Molinari, and Harry Saal as the

14    shareholder group.  Is that okay?

15         A.   Yes.                                                 10:21

16         Q.   Okay.  Have you talked with any individuals from

17    the shareholder group?

18         A.   I did have an interview with all three of them

19    early on, and then I had a follow-up conversation with

20    Mr. Molinari.                                                  10:21

21         Q.   So the first interview you had, all three were

22    together?

23         A.   Yes.

24         Q.   How long did that last?

25         A.   About an hour.  I don't know exactly.  I think      10:21
```

                                                        Page 36

```
 1    it was scheduled for an hour.  Might have been over a      10:21

 2    little bit now that I think about it, but I know it was

 3    scheduled for an hour.

 4         Q.   What were you trying to learn from those

 5    gentlemen during that conversation?                        10:21

 6         A.   It was very early on, so I was getting

 7    background and just understanding their perspective, and

 8    they were telling me about the drugs that were in

 9    development.

10         Also they talked about the neurological applications  10:22

11    to RT-001.  And mostly Mr. Molinari talked, but they all

12    talked to some extent about the products and their

13    development.

14         Q.   Did they explain to you how long it had been

15    since they were involved with the development of the       10:22

16    products?

17         A.   You know, they might have, but I don't remember

18    that.

19         Q.   What did they -- Did any of them -- Were they

20    talking with you about RT-011?                             10:22

21         A.   Most of what they had to say was about RT-001.

22    I don't recall any specific information about the

23    ophthalmology product that they offered.

24         Q.   Okay.  Did they inform you that the recent

25    trials of RT-001 had failed?                               10:23
```

Page 37