IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RETROTOPE, INC., | Case No. 22-10228 (JTD) |
| Debtor. | Hearing Date: 9/27/2022 at 10:00 am<br>Objection Date: 9/20//2022 |

## SHAREHOLDER GROUP'S MOTION FOR SUBSTANTIAL CONTRIBUTION CLAIM

Charles Cantor, Robert Molinari and Harry Saal ("Dr. Saal") (collectively, the "Shareholder Group"), submit this motion (the "Motion") for a substantial contribution claim in the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case") of Retrotope, Inc. (the "Debtor"). In support of this Motion, the Shareholder Group respectfully represents the following:

### FACTUAL BACKGROUND

1. Founded in 2006, the Debtor was a clinical stage biopharmaceutical company, focused on developing neurologic and ophthalmological drugs. The Debtor has two primary experimental development stage drugs, denominated RT001 and RT011. From its formation and through its bankruptcy case, the Debtor was headquartered in Los Altos, California.

1

2. By December 2021, clinical trials for RT001 had failed or been inconclusive. As the Shareholder Group previously explained (in the Preliminary Statement to the Motion to Dismiss), such failures do not necessarily mean that a drug does not work. Indeed, RT001 has shown substantial evidence of benefit in dozens of treatment-years of compassionate use dosing, and even showed some effects in the "failed" trials. These trials did not meet their pre-specified endpoints required by FDA in all cases, but some did meet statistical endpoints that failed to satisfy the FDA of efficacy without additional trials, or may have elucidated data by which future successful trials could designed. This is typical of the process of drug discovery. By industry standards these RT001 trials indeed failed, but the drug may well be approvable with new endpoints, different FDA strategies, or better designed or managed trials. Notwithstanding these failures, everyone associated with the Debtor recognized that it had extremely valuable intellectual property developed over the last sixteen years. And, the Debtor's other product, RT011, is a potentially revolutionary drug for the treatment of dry advanced macular degeneration (AMD) and other retinal diseases.

3. Other than its ongoing trade debt, immediately prior to the bankruptcy filing, the Debtor had no other liabilities and had no secured debt. And, the Debtor was balance sheet solvent. In fact, at the end of January 2022, according to the Debtor's balance sheet attached to the Petition, the Debtor held $4,203,543 in cash and cash equivalents.

4. Since its formation, the Debtor raised approximately $82 million from its shareholder investors. There are numerous classes of shares, including Series A Preferred Stock, Series A-1 Preferred Stock, Series A-2 Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series D Preferred Stock (collectively, the "Preferred Stock"), and Common Stock.

5.  Individual members of the Shareholder Group hold shares in each of the different classes of shares. But, as the Debtor repeated pointed out, collectively, the Shareholder Group only holds less than 20% of the Debtor's various classes of shares. By contrast, Dr. Mehta and his affiliated entities hold less than 30% of the Debtor's various classes of shares.

6.  On December 30, 2021 and January 21, 2022, the Debtor's corporate counsel disclosed the failure of the RT001 trials to major shareholders with Preferred information rights, and then to all shareholders via a communication. At the same time, the Debtor's then Board of Directors solicited approval from the shareholders of a new round of financing to continue supporting continued efforts to self-develop the drug products. That new financing round would have severely diluted the existing common and preferred shareholders, but not the Series D shareholders led by Nitin Mehta ("Dr. Mehta") and his family members and their corporations and trusts (the "January 21 Letter"). According to the January 21 Letter:

> The trials of RT001 have failed: As many of you know, the Company has pursued an aggressive strategy to show that RT001 is effective in orphan neurological diseases. In summary, the molecule has been found to be ineffective in significantly meeting desired primary or secondary endpoints in FA, ALS, and INAD. This is a significant setback.

7.  In February 2022, pursuant to their rights under the Certificate of Incorporation, the Debtor's Preferred Shareholders rejected this proposal.

8.  Following this outcome, while Dr. Mehta and Anil Kumar ("Mr. Kumar") were still on the Board, the Debtor made another proposal to the shareholders. It proposed that the Preferred Shareholders approve a slightly modified set of terms which still included significant dilution of

shareholders other than Dr. Mehta, or an assignment for the benefit of creditors, to be conducted by Rock Creek Advisors. Following a meeting, the Debtor's shareholders rejected both the revised financing proposal made by Dr. Mehta and an assignment for the benefit of creditors ("ABC").

9. Instead of an ABC, numerous shareholders including the Shareholders Group, advocated for a different approach. They urged the Debtor to partner with a much larger pharmaceutical company. That view was driven, in addition to the failed trials of RT001, by the inability of the company to financially support the multiple trials started by the Debtor at a time it did not have the funds to finish any of them. Instead of expending additional multi-millions of dollars, at a burn rate of approximately $2 million each month, in drug development costs, numerous shareholders, included the Shareholder Group, believed that the Debtor should curtail the scope of its operations, reduce its cash burn rate and, instead, embark upon an industry-normative process of partnering and licensing the Debtor's valuable intellectual property with a larger biopharmaceutical company.

10. As was established during the recent sale approval/plan confirmation trial, such licensing and partnering are an integral part of most all—even the most well-funded—biopharmaceutical companies, a route the Debtor chose not to seriously explore during the months leading up to the bankruptcy filing.

11. The Debtor filed its bankruptcy petition (the "Petition") on March 21, 2022 (the "Petition Date"), under subchapter V.

12. As it had during the months leading up to the bankruptcy filing, during March 2022 with its newly constituted board in place, the Debtor still had not seriously explored a licensing or partnership structure. Instead, the Debtor decided to proceed with a straight asset sale to Dr.

Mehta's company, RTMFP Enterprises Inc. ("RTMFP"), for roughly $20 million. This purchase price was structured as a credit bid against the projected $10 million debtor in possession (DIP) loan and another $10 million to pay its trade creditors, its Chapter 11 administrative expenses, including professional fees, and provide a modest distribution to its Series D shareholders, of which Dr. Mehta and his family and their companies and trusts held roughly 85% of the issued shares.

13. This fact is abundantly clear from the "first day" pleadings filed by the Debtor. As the Debtor stated in its DIP approval motion, paragraph 3: "[T]he Debtor commenced this Case to conduct a prompt sale of all or substantially all of its assets or other restructuring through a plan with the goal of maximizing achievable value." And, in Mr. Kumar's declaration in support of the Debtor's first day motions [ECF 9], he made no mention of any pre-bankruptcy efforts by the Debtor's management or its different compositions of Boards of Directors to explore a licensing or royalty structure with a larger biopharmaceutical company.

14. Because of the Debtor's failure to truly explore industry-normative transactions with larger biopharmaceutical companies and in order to try to protect the interests of all classes of shareholders and maximize the value of their equity investments, and because an equity committee is not appointed in a subchapter V case (absent court order), the Shareholder Group was forced to step into the vacuum in order to try to salvage the long-term investments made by all equity holders. In so doing, the Shareholder Group, as an ad hoc committee, took the following steps during the bankruptcy case, all of which were designed to benefit the collective group of all equity holders:

   a. Challenged the Debtor's DIP financing motion, which was one of the Debtor's "first day" motions and challenged certain supposed critical vendor expenditures (such as

creating packaging for the developmental drug RT011, at a cost nearing $1 million). In the DIP financing motion, the Debtor requested to borrow $10 million for the four months of the sale process. As the Shareholder Group pointed out in their objection to the DIP financing motion, this post-petition borrowing would significantly erode the ultimate recovery by the Debtor's equity holders;

b. Prosecuted a motion to dismiss the bankruptcy case, to allow the pre-bankruptcy shareholder disagreements and stalemate to be resolved under Delaware law by the Delaware Chancery Court. That motion was supported by dozens of the Debtor's shareholders, approximately 40 of whom signed joinders. [*See* ECF 71-91, 95-112];

c. Raised objections to the proposed sale procedures, in order to ensure that there was fairness and proper valuation diligence for any competing bidder that intended to submit a bid containing milestones and royalty payments, in partial lieu of cash consideration; and

d. Attempted to have a shareholder representative appointed to the Debtor's board of directors, which was acknowledged in testimony as a significant concern of the only bidder competing with the stalking horse bidder.

In taking these steps, the Shareholder Group was assisted by three law firms: i) Buchalter, whose lead attorney—Jeffrey Garfinkle—is one of the nation's leading pharmaceutical insolvency attorneys; ii) The Powell Firm, which served as Delaware counsel; and iii) Bergenson LLP, whose lead attorney—Adam Trigg—specializes in shareholder disputes involving Silicon Valley clients.

15. At the same time many of these steps were being undertaken, the Shareholder Group actively canvassed their high-level industry connections in an attempt to elicit interest in providing a competing proposal to Dr. Mehta's company's stalking horse bid. The Shareholder

Group did an extensive outreach to numerous pharmaceutical companies, such as Kodiak Sciences ("Kodiak"), which would be capable of developing the Debtor's assets and would provide a credible, long-term potential return to all of the Debtor's equity holders via milestones and royalty structures, extremely common contingent payment structures throughout the biopharmaceutical industry.

16. In late March 2022, at the Shareholder Group's request, Kodiak was introduced to the Shareholder Group by Stanford University's Chair of Ophthalmology. That doctor received an email from Dr. Saal, a member of the Shareholder Group, stating that there might be a good fit between Kodiak's strategic interest in ophthalmology drug developments and Debtor's RT011 preclinical drug product, which had new data untarnished by the clinical trial failures that showed robust safety and efficacy in retinal degenerative diseases, and requesting an introduction to Kodiak's senior management.

17. Subsequent to and as a direct result that introduction, members of the Kodiak corporate leadership team, including Dr. Victor Perlroth, Kodiak's Chief Executive Officer, and Jason Ehrlich, Kodiak's chief medical officer, met and communicated with each of the three members of the Shareholder Group on several occasions. During those meetings and calls, the Shareholder Group explained the Debtor's RT011 drug product and the underlying science, using newly published (March, 2022) public data which had been presented at an industry conference as early as November 2021. The new data demonstrated an oral (non-injectable) drug to treat age-related macular degeneration (AMD), additional retinal diseases, and other rare neurological and retinal disorders.[1]

---

[1] The Shareholder Group understands that SSG Capital Advisors ("SSG"), Retrotope's investment banker, sent out a one-page flyer to hundreds of potential interested parties. Kodiak, even if it had been contacted by SSG in a mass outreach of this sort, did not respond. Kodiak's President and Chief Executive Officer, testified at the sale approval

18. As a direct result of the meetings and communications between Kodiak and the Shareholder Group and their continued efforts to procure and encourage additional bidders for Debtor's assets, Kodiak signed a nondisclosure agreement and gained access to the data room established by Debtor's investment banker. Even after gaining access to that data room, Kodiak's leadership team continued having discussions with the three members of the Shareholder Group, in order better understand the underlying science and drug products, the rationale and underpinnings of the bankruptcy filing, including the circumstances leading up to the bankruptcy, the history of the assets, key team members and the like.

19. As part of Kodiak's due diligence, it reviewed Debtor's corporate ownership structure and current board structure. Kodiak conveyed a concern to members of the Shareholder Group that Dr. Mehta's company, RTMFP, the stalking horse bidder, could bid up to a certain price that would return cash above the debtor in possession loan, the trade payables and Chapter 11 expenses mostly to him and his family entities due to his dominant position in the Series D preferred round of approximately $30 Million. In light of Debtor's capital structure and because Dr. Mehta's company was the stalking horse bidder, Kodiak expressed the concern that any overbid it submitted could be an exercise in futility. These concerns that were taking place during Kodiak's due diligence process were conveyed to the Shareholder Group.

20. The Shareholder Group provided Kodiak with, or identified, key pleadings filed by the Shareholder Group, in which they strongly advocated for Debtor to pursue an industry-normative licensing and future royalty transaction with a larger pharmaceutical company and deal

---

and plan confirmation trial that Kodiak receives numerous solicitations for various collaborations or transactions and cannot consider and respond to all of them. *See* Transcript for July 11, 2022 Trial, p. 244, lls. 13-21.

It is highly doubtful that this mass mailing of a one-page flyer resulted in any serious interest in acquiring or licensing the Debtor's assets. Upon receiving the flyer, one recipient—an experienced investor in Retrotope and numerous other biopharmaceutical companies—sent an email to Robert Molinari, with the comment: "Total rookie approach by an IB who has a mailing list."

structure that would benefit all classes of shareholders. The Shareholder Group also provided Kodiak transcripts of several hearings held before the Bankruptcy Court in which the Shareholder Group were active participants.

21.    During the communications with the Shareholder Group, Kodiak expressed concerns that Debtor's current management and board, including its two outside directors, were all hired and approved by Debtor's pre-bankruptcy board, while Dr. Mehta and Mr. Kumar were members. This arrangement appeared to make Kodiak uncomfortable that a board so selected could and would be independent in reviewing, evaluating, and valuing competing bids, particularly one that included future milestone and royalty payments.

22.    The Shareholder Group attempted to allay these concerns by having the Debtor's common shareholders elect their own representative to Debtor's board, after the President, Mr. Kumar, had resigned that position as the "Common Director" due to association with Mr. Mehta, and no new president nor Common Director was appointed, thus further encouraging a Kodiak bid. The Shareholder Group then successfully obtained a majority of the Debtor's common shareholders to elect their designee as the "Common Director," further encouraging Kodiak in their bid. Unfortunately, the Company refused to seat the new director, claimed to have secretly appointed Dr. Milner, an existing preferred director, as president within 48 hours of the Shareholder Group soliciting votes for the open position, and that he was by prior voting agreements the Common Director, without ever actually conducting a required vote of the Debtor's common shareholders.

23.    As a direct result of the legal work done by the Shareholder Group, including their actions during the bankruptcy case, as described above in paragraph 14, Kodiak decided to submit an overbid and was the highest bidder at the start of the auction, with an initial bid of $20.2 million

(the projected $10 million balance of the DIP loan plus $10.2 million in cash). During the auction, Kodiak submitted a further overbid which included milestone and royalty payments.

24. Debtor valued the future milestone and royalty payments at roughly $8.0 million. Immediately following that bid, Dr. Mehta's company, RTMFP, bid another roughly $1 million above Debtor's value including the future milestone and royalty payments. Kodiak declined to bid further and RTMFP was announced as the winning bidder with a final bid of $29 million), $9 million more than the $20 million stalking horse bid.

25. But for the work done by the Shareholder Group in meeting and communicating with Kodiak and the legal work done by the Shareholder Group prior to Kodiak submitting its initial overbid and then its subsequent overbid, Kodiak would not have made either of its two bids, and the sale would have concluded with the stalking horse bid which was estimated to return $3 million to shareholders, not the $12 million which resulted from the competitive auction. Kodiak's reliance on the Shareholder Group and their legal work directly generated that additional amount of consideration now poised to be distributed to Debtor's shareholders.

26. In considering this Motion, it is important to emphasize a critical point. The Shareholder Group, and each of its three members, never took any action primarily to benefit themselves individually on account of their various equity interests in the Debtor. Rather, at all times, they acted in the interests, and to maximize the recovery by the collective body of all classes of the Debtor's equity holders, including roughly 150 non-Series D shareholders. Those benefitting equity holders include Dr. Mehta, his family members, and their trusts and companies, which own Series D and C shares. If the Shareholder Group succeeded in raising the ultimate purchase price, which they did by roughly $9 million and sought much more in terms of a higher

valuation of Kodiak's future milestone payments and royalty stream, most classes of shareholders including all of Dr. Mehta's and his family's shares would benefit by the increased recovery.

27. The Shareholder Group recognizes that the Court ultimately upheld the Debtor's board decisions with respect to i) valuing the last Kodiak bid; and ii) accepting RTMFP's final bid of $29 million. But, it cannot be denied that but for the efforts of the Shareholder Group to find alternative bidders, Kodiak would not have participated in the auction and the final purchase price would not have increased by $9 million. And, had the Debtor's board ascribed a higher value to Kodiak's milestone and royalty payments, the ultimate recovery by the Debtor's equity holders might have been much higher. This is particularly true in light of Kodiak's recent success in a phase 3 trial for one of its drug candidates[2] and the resulting increase in its stock price.

## LEGAL STANDARD

28. Section 503(b)(3)(D) provides administrative-expense status for the actual, necessary expenses of equity holders and an ad hoc committee of equity holders that makes a substantial contribution in a chapter 11 case. Section 503(b)(4) provides administrative-expense status for the reasonable fees and actual, necessary expenses of such entity's attorneys and accountants. Section 503(b)(3)(D) has two purposes: (1) to encourage creditors to participate meaningfully in the reorganization process; and (2) to minimize fees and administrative expenses and thereby maximize creditor recoveries. *Lebron v. Mechem Financial Inc.*, 27 F.3d 937, 944 (3d Cir. 1994).

29. Equity holders or an ad hoc group of equity holders makes a substantial contribution if its efforts provide an "actual and demonstrable benefit to the debtor's estate and the creditors." *Id*. at 943-44 (citation omitted) (quoting *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988)).

---

[2] https://www.fiercebiotech.com/biotech/kodiak-matches-regenerons-eylea-macular-edema-phase-3-lighting-beacon-raise-hopes-after

Furthermore, to be compensable under section 503(b)(3)(D) and (b)(4), the equity holders' activities must have "benefit[ed] the estate as a whole." *See* Lebron, 27 F.3d at 944.

30. A party seeking an award of administrative expenses has the burden of proving its claim by a preponderance of the evidence. *In re M &G U.S. Corp.*, 599 B.R.256 (Bankr. D. Del. 2019). Creditors seeking an award of administrative expenses are, in particular, "presumed to be self-interested unless they establish that their actions are designed to benefit others who would foreseeably be interested in the estate." *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937 at 946. To overcome this presumption, the movant must offer something more than self-serving statements regarding its involvement in the case. *In re M &G U.S. Corp.*, 599 at 262. "Corroborating testimony by a disinterested party ... has proven to be a decisive factor in awarding compensation." *In re KiOR, Inc.* 567 B.R. 451, 459 (D. Del. 2017). However, disinterested testimony is not an exclusive predicate for a finding of substantial contribution. *In re Deval Corp.*, 592 B.R. 587, 599 (Bankr. E.D. Pa. 2018). "[A] court may take into account its first-hand observance of the services provided throughout the entire chapter 11 case in determining whether an applicant has demonstrated that it made a substantial contribution to the case." *Id*.

31. Here, as the Court itself witnessed, each of the activities for which the Shareholder Group is seeking a substantial contribution claim benefitted the estate as a whole, in that they directly resulted in a roughly $9 million increase in the final purchase price and the corresponding increase in recovery by certain of the Debtor's preferred shareholders. And, but for the actions of the Shareholder Group, it is extremely doubtful that Kodiak would have participated in the auction and that final purchase price would increase by roughly $9 million, thereby increasing the recovery by certain of the Debtor's equity holders.

## SHAREHOLDER GROUP'S SPECIFIC ACTIVITIES RESULTED IN

## A DIRECT AND TANGIBLE BENEFIT TO THE ESTATE

32. The Shareholder Group has categorized its legal expenses and costs into five general categories. They are:

i) Legal work related to the Debtor's "First Day" motions and general case matters. (Exhibit A to the supporting Declaration of Robert Molinari), in the amount of $33,498.50;

ii) Legal work related to the motion to dismiss the bankruptcy case (Exhibit B to the supporting Declaration of Robert Molinari), in the amount of $120,000;

iii) Legal work related to bidding procedures and sale process (Exhibit C to the supporting Declaration of Robert Molinari), in the amount of $85,818;

iv) Legal work related to filling empty board seat, designated for the Debtor's common shareholders (Exhibit D to the supporting Declaration of Robert Molinari), in the amount of $62,650; and

v) Post-auction legal work related to challenging auction outcome and final approval of sale motion and liquidating plan, including preparation and participation in the two-day trial that took place on July 11 and 12, 2022.

For purposes of this motion, the Shareholder Group is only requesting allowance of a substantial contribution claim for their legal fees and costs for the first four categories of work. The Shareholder Group *is not* seeking a substantial contribution claim for any post-auction work which was not successful at adjusting the deemed cash value of Kodiak's milestone and royalty offer.

33. In addition to these four categories of fees, from the Petition Date through June 26, 2022 (the date of the auction), the Shareholder Group incurred costs totaling $4,849.49. A summary of those costs is attached hereto as Exhibit E.

34. As explained herein and in the supporting declarations and exhibits, the legal work of the Shareholder Group directly resulted in an additional $9 million to the estate, thereby increasing the recovery by certain of the Debtor's equity holders. Again, but for these efforts, this increased recovery would not have occurred.

**CONCLUSION**

Based on the foregoing, pursuant Bankruptcy Code Sections 503(b)(3)(D) and 503(b)(4), the Shareholder Group respectfully requests allowance of a substantial contribution claim in the aggregate amount of $306,815.99, which includes $301,966.50 in legal fees and $4,849.49 in costs.

Dated:  August 12, 2022　　　　　　　　THE POWELL FIRM, LLC
　　　　　　　　　　　　　　　　　　　Wilmington, Delaware

　　　　　　　　　　　　　　　　　　　By:　　　　　/s/ Jason C. Powell

　　　　　　　　　　　　　　　　　　　Jason C. Powell (No. 3768)
　　　　　　　　　　　　　　　　　　　1201 No. Orange Street
　　　　　　　　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　　　　　　　　Telephone: 302.650.1572
　　　　　　　　　　　　　　　　　　　Fax: 302.650.1574
　　　　　　　　　　　　　　　　　　　Email: jpowell@delawarefirm.com

　　　　　　　　　　　　　　　　　　　-AND-

　　　　　　　　　　　　　　　　　　　BUCHALTER, A Professional Corporation

　　　　　　　　　　　　　　　　　　　By:　　　　　/s/ Jeffrey K. Garfinkle

　　　　　　　　　　　　　　　　　　　JEFFREY K. GARFINKLE
　　　　　　　　　　　　　　　　　　　(Cal. Bar. No. 153496; Wash. Bar No. 55968)
　　　　　　　　　　　　　　　　　　　18400 Von Karman Ave., Suite 800
　　　　　　　　　　　　　　　　　　　Irvine, CA  92612
　　　　　　　　　　　　　　　　　　　Telephone: 949.760.1121
　　　　　　　　　　　　　　　　　　　Email: jgarfinkle@buchalter.com

　　　　　　　　　　　　　　　　　　　Attorneys for Shareholder Group, consisting of Harry Saal, Robert Molinari and Charles Cantor