IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RETROTOPE, INC., | Case No. 22-10228 (JTD) |
| Debtor. | |

## DECLARATION OF ROBERT MOLINARI IN SUPPORT OF MOTION FOR SUBSTANTIAL CONTRIBUTION CLAIM

I, Robert Molinari, declare:

1. I hold an A.B. degree from Dartmouth College, an MBA degree from Dartmouth's Amos Tuck School of Business, and a Ph.D. degree in Biophysical Chemistry from Brown University. I am a member of the American Academy of Neurology, and am a serial entrepreneur in the biotech research and tools company space. I was also one of the founders of Retrotope, Inc. (the "Debtor"), and served as its President and Chief Executive Officer from its first financing in 2008 until August 14, 2020, at which time I resigned as an officer the Debtor. Throughout my tenure as one of the Debtor's officers, I also served as a member of its Board of Directors. I have also been, and continue to be, a shareholder of the Debtor. I own Series A, A-1, A-2, B, and C Preferred Stock and am the largest Common Stock shareholder. I am part of the Shareholder Group that filed the Motion for Substantial Contribution. I make this Declaration in support of that Motion.

2. Founded in 2006, the Debtor was a clinical stage biopharmaceutical company, focused on developing neurologic and ophthalmological drugs. The Debtor had two primary

1

BN 72226541v1

experimental development stage drugs, denominated RT001 and RT011. From its formation and through its bankruptcy case, the Debtor was headquartered in Los Altos, California.

3. By December 2021, I (in my capacity as one of the Debtor's shareholders) was advised by the Debtor that clinical trials for RT001 had failed or been inconclusive. In my experience, such failures do not necessarily mean that a drug does not work. Indeed, RT001 has shown substantial evidence of benefit in dozens of treatment-years of compassionate use dosing, and even showed some effects in the "failed" trials. These trials did not meet their pre-specified endpoints required by FDA in all cases, but some did meet statistical endpoints that failed to satisfy the FDA of efficacy without additional trials, or may have elucidated data by which future successful trials could designed. This is typical of the process of drug discovery. By industry standards these RT001 trials indeed failed, but the drug may well be approvable with new endpoints, different FDA strategies, or better designed or managed trials. Notwithstanding these failures, everyone associated with the Debtor recognized that it had extremely valuable intellectual property developed over the last sixteen years. And, the Debtor's other product, RT011, is a potentially revolutionary drug for the treatment of dry advanced macular degeneration (AMD) and other retinal diseases.

4. Other than its ongoing trade debt, immediately prior to the bankruptcy filing, the Debtor had no other liabilities and had no secured debt. And, the Debtor was balance sheet solvent. In fact, at the end of January 2022, according to the Debtor's balance sheet attached to the Petition, the Debtor held $4,203,543 in cash and cash equivalents.

5. Since its formation, the Debtor raised approximately $82 million from its shareholder investors. There are numerous classes of shares, including Series A Preferred Stock, Series A-1 Preferred Stock, Series A-2 Preferred Stock, Series B Preferred Stock, Series C

BN 72226541v1

Preferred Stock, and Series D Preferred Stock (collectively, the "Preferred Stock"), and Common Stock.

6.  The three members of the Shareholder Group, myself included, collectively hold shares in each of the different classes of shares. But, collectively, the Shareholder Group only holds less than 20% of the Debtor's various classes of shares. By comparison, Mehta-affiliated entities hold less than 30% of the Debtor's various classes of shares.

7.  On December 30, 2021 and January 21, 2022, the Debtor's corporate counsel disclosed the failure of the RT001 trials to me and other major shareholders with Preferred information rights, and then to all shareholders via a communication. At the same time, the Debtor's then Board of Directors solicited approval from the shareholders of a new round of financing to continue supporting continued efforts to self-develop the drug products. That new financing round would have severely diluted the existing common and preferred shareholders, but not the Series D shareholders led by Nitin Mehta ("Dr. Mehta") and his family members and their corporations and trusts (the "January 21 Letter"). According to the January 21 Letter:

> The trials of RT001 have failed: As many of you know, the Company has pursued an aggressive strategy to show that RT001 is effective in orphan neurological diseases. In summary, the molecule has been found to be ineffective in significantly meeting desired primary or secondary endpoints in FA, ALS, and INAD. This is a significant setback.

8.  In February 2022, the Debtor's Preferred Shareholders rejected this proposal.

9.  Following this outcome, while Dr. Mehta and Anil Kumar ("Mr. Kumar") were still on the Board, the Debtor made another proposal to the shareholders. It proposed that the Preferred Shareholders approve a slightly modified set of terms which still included significant dilution of

shareholders other than Dr. Mehta, or an assignment for the benefit of creditors, to be conducted by Rock Creek Advisors. Following a meeting, the Debtor's shareholders rejected both the revised financing proposal made by Dr. Mehta and an assignment for the benefit of creditors ("ABC").

10. Instead of an ABC, numerous shareholders including me and the other two members of the Shareholders Group, advocated for a different approach. We urged the Debtor to partner with a much larger pharmaceutical company. That view was driven, in addition to the failed trials of RT001, by the inability of the company to financially support the multiple trials started by the Debtor at a time it did not have the funds to finish any of them. Instead of expending additional multi-millions of dollars, at a burn rate of approximately $2 million each month, in drug development costs, I believed that the Debtor should curtail the scope of its operations, reduce its cash burn rate and, instead, embark upon an industry-normative process of partnering and licensing the Debtor's valuable intellectual property with a larger biopharmaceutical company.

11. Such licensing and partnering arrangements are an integral part of most all—even the most well-funded—biopharmaceutical companies, a route the Debtor chose not to seriously explore during the months leading up to the bankruptcy filing.

12. The Debtor filed its bankruptcy petition (the "Petition") on March 21, 2022 (the "Petition Date"), under subchapter V.

13. As it had during the months leading up to the bankruptcy filing, during March 2022 with its newly constituted board in place, the Debtor still had not seriously explored a licensing or partnership structure. Instead, the Debtor decided to proceed with a straight asset sale to Dr. Mehta's company, RTMFP Enterprises Inc. ("RTMFP"), for roughly $20 million. This purchase price was structured as a credit bid against the projected $10 million debtor in possession (DIP) loan and another $10 million to pay its trade creditors, its Chapter 11 administrative expenses,

including professional fees, and provide a modest distribution to its Series D shareholders, of which Dr. Mehta and his family and their companies and trusts held roughly 85% of the issued shares.

14.  Because of the Debtor's failure to truly explore industry-normative transactions with larger biopharmaceutical companies and in order to try to protect the interests of all classes of shareholders and maximize the value of their equity investments, and because an equity committee is not appointed in a subchapter V case (absent court order), the Shareholder Group was forced to step into the vacuum in order to try to salvage the long-term investments made by all equity holders. In so doing, the Shareholder Group, as an ad hoc committee, took the following steps during the bankruptcy case, all of which were designed to benefit the collective group of all equity holders:

   a. Challenged the Debtor's DIP financing motion, which was one of the Debtor's "first day" motions and challenged certain supposed critical vendor expenditures (such as creating packaging for the developmental drug RT011, at a cost nearing $1 million). In the DIP financing motion, the Debtor requested to borrow $10 million for the four months of the sale process. As the Shareholder Group pointed out in our objection to the DIP financing motion, this post-petition borrowing would significantly erode the ultimate recovery by the Debtor's equity holders;

   b. Prosecuted a motion to dismiss the bankruptcy case, to allow the pre-bankruptcy shareholder disagreements and stalemate to be resolved under Delaware law by the Delaware Chancery Court. That motion was supported by dozens of the Debtor's shareholders, approximately 40 of whom signed joinders;

c. Raised objections to the proposed sale procedures, in order to ensure that there was fairness and proper valuation diligence for any competing bidder that intended to submit a bid containing milestones and royalty payments, in partial lieu of cash consideration; and

d. Attempted to have a shareholder representative appointed to the Debtor's board of directors, which was acknowledged in Dr. Victor Perlroth's testimony as a significant concern of Kodiak Science, the only bidder competing with the stalking horse bidder.

15. In taking these steps, the Shareholder Group was assisted by three law firms: i) Buchalter, whose lead attorney—Jeffrey Garfinkle—is one of the nation's leading pharmaceutical insolvency attorneys; ii) The Powell Firm, which served as Delaware counsel; and iii) Bergenson LLP, whose lead attorney—Adam Trigg—specializes in shareholder disputes involving Silicon Valley clients.

16. At the same time many of these steps were being undertaken, the Shareholder Group actively canvassed our high-level industry connections in an attempt to elicit interest in providing a competing proposal to Dr. Mehta's company's stalking horse bid. I and the other two members of the Shareholder Group did an extensive outreach to numerous pharmaceutical companies, such as Kodiak Sciences ("Kodiak"), which would be capable of developing the Debtor's assets and would provide a credible, long-term potential return to all of the Debtor's equity holders, including Dr. Mehta's holdings, via milestones and royalty structures, extremely common contingent payment structures throughout the biopharmaceutical industry.

17. In late March 2022, at the Shareholder Group's request, Kodiak was introduced to the Shareholder Group by Stanford University's Chair of Ophthalmology. That doctor received

an email from Dr. Saal, a member of the Shareholder Group, stating that there might be a good fit between Kodiak's strategic interest in ophthalmology drug developments and the Debtor's RT011 preclinical drug product, which had new data untarnished by the clinical trial failures that showed robust safety and efficacy in retinal degenerative diseases, and requesting an introduction to Kodiak's senior management.

18. Subsequent to and as a direct result that introduction, members of the Kodiak corporate leadership team, including Dr. Victor Perlroth, Kodiak's Chief Executive Officer, and Jason Ehrlich, Kodiak's chief medical officer, met and communicated with me and the other two members of the Shareholder Group on several occasions. During those meetings and calls, we explained the Debtor's RT011 drug product and the underlying science, using newly published (March, 2022) public data which had been presented at an industry conference as early as November 2021. The new data demonstrated an oral (non-injectable) drug to treat age-related macular degeneration (AMD), additional retinal diseases, and other rare neurological and retinal disorders.

19. As a direct result of the meetings and communications between Kodiak and the Shareholder Group and our continued efforts to procure and encourage additional bidders for the Debtor's assets, Kodiak signed a nondisclosure agreement and gained access to the data room established by the Debtor's investment banker. Even after gaining access to that data room, Kodiak's leadership team continued having discussions with me and the other two three members of the Shareholder Group, in order better understand the underlying science and drug products, the rationale and underpinnings of the bankruptcy filing, including the circumstances leading up to the bankruptcy, the history of the assets, key team members and the like.

20. I understand that shortly after the Petition Date, SSG Capital Advisors ("SSG"), Retrotope's investment banker, sent out a one-page flyer to hundreds of potential interested parties, including Kodiak. In my experience, as a long-time executive in the biopharmaceutical industry, it is highly doubtful that this mass mailing of a one-page flyer resulted in any serious interest in acquiring or licensing the Debtor's assets. Upon receiving the flyer, one recipient (an experienced investor in Retrotope and numerous other biopharmaceutical companies) forwarded me SSG's mass email and the one-page flyer with the comment: "Total rookie approach by an IB who has a mailing list."

21. As part of Kodiak's due diligence, it reviewed the Debtor's corporate ownership structure and current board structure. Kodiak conveyed a concern to me and the other two members of the Shareholder Group that Dr. Mehta's company, RTMFP, the stalking horse bidder, could bid up to a certain price that would return cash above the debtor in possession loan, the trade payables and Chapter 11 expenses mostly to him and his family entities due to his dominant position in the Series D preferred round of approximately $30 Million. In light of the Debtor's capital structure and because Dr. Mehta's company was the stalking horse bidder, Kodiak expressed the concern that any overbid it submitted could be an exercise in futility. These concerns which arose during Kodiak's due diligence process were conveyed to the Shareholder Group.

22. During the communications with me and the two other members of the Shareholder Group, Kodiak expressed concerns that the Debtor's current management and board, including its two outside directors, were all hired and approved by the Debtor's pre-bankruptcy board, while Dr. Mehta and Mr. Kumar were members. This arrangement appeared to make Kodiak uncomfortable that a board so selected could and would be independent in reviewing, evaluating, and valuing competing bids, particularly one that included future milestone and royalty payments.

23. We attempted to allay these concerns by having the Debtor's common shareholders elect their own representative to the Debtor's board, after the President, Mr. Kumar, had resigned that position as the "Common Director" and no new president nor Common Director was appointed, thus further encouraging a Kodiak bid. We then successfully obtained a majority of the Debtor's common shareholders to elect their designee as the "Common Director," further encouraging Kodiak in their bid. Unfortunately, the Company refused to seat the new director, claimed to have secretly appointed Dr. Milner, an existing preferred director, as president within 48 hours of the Shareholder Group soliciting votes for the open position, and that he was by prior voting agreements the Common Director, without ever actually conducting a required vote of the Debtor's common shareholders.

24. As a direct result of the legal work done by the Shareholder Group, including our actions during the bankruptcy case, Kodiak decided to submit an overbid and was the highest bidder at the start of the auction, with an initial bid of $20.2 million (the projected $10 million balance of the DIP loan plus $10.2 million in cash). During the auction, Kodiak submitted a further overbid which included milestone and royalty payments.

25. The Debtor valued the future milestone and royalty payments at roughly $8.0 million. Immediately following that bid, Dr. Mehta's company, RTMFP, bid another roughly $1 million above the Debtor's value including the future milestone and royalty payments. Kodiak declined to bid further and RTMFP was announced as the winning bidder with a final bid of $29 million), $9 million more than the $20 million stalking horse bid.

26. But for the work done by me and the other two members of the Shareholder Group in meeting and communicating with Kodiak and our legal work prior to Kodiak submitting its initial overbid and then its subsequent overbid, I strongly believe that Kodiak would not have made

9

either of its two bids, and the sale would have concluded with the stalking horse bid which was estimated to return $3 million to shareholders, not the $12 million which resulted from the competitive auction. Kodiak's reliance on the Shareholder Group and our legal work directly generated that additional amount of consideration now poised to be distributed to the Debtor's shareholders.

27. In considering this Motion, it is important to emphasize a critical point. Neither I nor the other two members of the Shareholder Group ever took any action primarily to benefit ourselves individually on account of our various equity interests in the Debtor. Nor did we seek any personal remuneration of any kind. Rather, at all times, we acted in the interests, and to maximize the recovery by the collective body of all classes of the Debtor's equity holders, including roughly 150 non-Series D shareholders. Those benefitting equity holders include Dr. Mehta, his family members, and their trusts and companies, which own Series D and C shares. If we succeeded in raising the ultimate purchase price, which we did by roughly $9 million and sought much more in terms of a higher valuation of Kodiak's future milestone payments and royalty stream, most classes of shareholders including all of Dr. Mehta's and his family's shares would benefit by the increased recovery.

28. Attached hereto are the following spreadsheets itemizing the legal expenses incurred by me and the other two members of the Shareholder Group. Each of us is personally responsible for paying one-third of these legal fees and expenses:

   a. Legal work related to the Debtor's "First Day" motions and general case matters. (Exhibit A), in the amount of $33,498.50;

   b. Legal work related to the motion to dismiss the bankruptcy case (Exhibit B), in the amount of $120,000;

      c. Legal work related to bidding procedures and sale process (Exhibit C), in the amount of $85,818; and

      d. Legal work related to filling empty board seat, designated for the Debtor's common shareholders (Exhibit D), in the amount of $62,650.

29. In addition to these four categories of fees, from the Petition Date through June 26, 2022 (the date of the auction), the Shareholder Group incurred costs totaling $4,849.49. A summary of those costs is attached hereto as Exhibit E.

30. For purposes of this motion, I and the other two members of the Shareholder Group are only requesting allowance of a substantial contribution claim for our legal fees and costs for these four categories of work. We are not seeking a substantial contribution claim for any post-auction work, including the legal expenses and costs incurred in connection with the two day evidentiary hearing held on July 11 and 12, 2022, as we were not successful at adjusting the deemed cash value of Kodiak's milestone and royalty offer and reopening the auction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on my personal knowledge, and if called as a witness could competently testify thereto.

Executed on August 12, 2022 at Los Altos, California

_/s/ Robert Molinari_
Robert Molinari